LARRY O. GILL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; QUILTING CREATIONS BY D.J., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gill v. Commissioner
Docket Nos. 20100-91, 20188-91
United States Tax Court
T.C. Memo 1994-92; 1994 Tax Ct. Memo LEXIS 93; 67 T.C.M. (CCH) 2311; March 1, 1994, Filed *93 Decision will be entered under Rule 155. For petitioners: David J. Lewis and Mark J. Skakun. For respondent: Dawn Marie Krause. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax for the taxable years indicated: Additions to Tax
Year
Section Section Petitioner
Ended
Deficiency
6651(a)[1]
6653(a)(1)
Larry O. Gill
12/31/86
$ 15,617
$ --  $ -- 12/31/87
26,841
1,401
--
12/31/88
9,109
-- 455
Quilting Creations
4/30/86
8,371
393
--
by D.J., Inc.
4/30/87
34,443
8,611
--
4/30/88
76,867
-- --
Additions to Tax
Section
Section
Section Petitioner
6653(a)(1)(A)
6653(a)(1)(B)
6661(a) Larry O. Gill
$ 781   *
$ 3,904 2,144 *
6,710
--
--
2,277
Quilting Creations
4,649 *
--
by D.J., Inc.
8,148 *
8,611
3,843 *
19,217
*50% of the interest due on the portion of the
underpayment attributable to negligence.
Respondent determined that the entire amount of
each underpayment was due to negligence.
*94 The issues for decision in these consolidated cases are: (1) Is Quilting Creations by D.J., Inc. (Quilting) entitled to certain depreciation deductions with respect to a house in Dundee, Ohio, and do certain amounts Quilting expended for that house constitute constructive dividends to Larry O. Gill (Gill)? We hold that Quilting is not entitled to those depreciation deductions and that those expenditures constitute constructive dividends to Gill. (2) Is Quilting entitled to claim certain deductions relating to a house in Bolivar, Ohio, in excess of those allowed by respondent? We hold it is not. (3) a. Is Quilting entitled to deduct as additional compensation certain contributions it made to Gill's individual retirement account and certain premiums it paid for life insurance policies on the lives of Gill and Debra Bell (Bell)? We hold that Quilting is entitled to deduct those amounts. b. Are Quilting's payments of premiums on a policy insuring Bell's life includible in Gill's income as constructive dividends or additional compensation to him? We hold that they are not. (4) Is Quilting entitled to deduct certain expenses it incurred relating to various race cars, and do *95 those expenses constitute constructive dividends to Gill? We hold that Quilting is entitled to deduct those expenses to the extent allowed herein and that they do not constitute constructive dividends to Gill to the extent stated herein. (5) Are petitioners liable for the additions to tax for negligence for each of the years at issue? We hold that they are to the extent stated herein. (6) Are petitioners liable for the addition to tax for substantial understatement of income tax for each of the years at issue except Quilting's taxable year ended April 30, 1986? We hold that they are to the extent stated herein. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner Gill resided in Bolivar, Ohio, at the time he filed his petition. The principal place of business of petitioner Quilting at the time it filed its petition was Zoar, Ohio. Gill married Bell in 1978. Gill and Bell separated in 1985 and divorced on January 17, 1986. Gill has an eleventh grade education and no training or work experience in income tax matters. After Gill and Bell separated, Gill took some business classes. Petitioners' accountant, Harry Shaw (Shaw), prepared, or at *96 least worked on and reviewed, each of the returns filed by Gill and Quilting for each of the years at issue. Bell performed the bookkeeping for Quilting until sometime in 1986. Thereafter, Quilting hired an employee to take over the bookkeeping. During the years at issue, Gill had no role in Quilting's bookkeeping and accounting, having relied on Bell, the employee of Quilting who replaced Bell as bookkeeper, and Shaw with respect to these matters. Bell started Quilting as a sole proprietorship in 1979. Gill originally worked in the business on a part-time basis, but was fully involved in the business by 1982. Quilting was incorporated under the laws of Ohio on August 6, 1984. At all material times, Quilting was engaged in the design and manufacture of stencils. The stencils designed and manufactured by Quilting are used for quilts, arts and crafts, and clothing. Prior to the time Bell and Gill separated in 1985, Bell owned the majority of the Quilting stock and made most of the business decisions relating to Quilting's operations. [2] Following their separation, Gill became, and remained throughout the years at issue, the sole shareholder of Quilting. During those years, *97 Gill was the sole officer of Quilting and was in charge of running the business. In the early years of its operations, Quilting marketed its products directly to consumers through retail trade shows throughout the United States. By 1985, Quilting had phased out marketing its products at retail trade shows and was marketing only at wholesale trade shows where it sold its products to retailers and large corporations. During the years 1986 through 1988, Quilting attended wholesale trade shows on a worldwide basis. During those years, about 10 percent of Quilting's customers were located in Ohio. For the years indicated, Quilting had the following amounts of total gross receipts and gross receipts from Ohio that were included in total gross receipts: Taxable Year
Gross Receipts
Ended Gross Receipts
From Ohio April 30, 1986
$ 1,087,314
$ 48,000
April 30, 1987
1,423,357
60,000
April 30, 1988
1,506,630
72,000
*98 In September 1978, Gill and Bell purchased a house in Dundee, Ohio (the Dundee house), on which they made the mortgage loan and real estate tax payments. The purchase price was $ 32,000. The title to, and the mortgage loan for, the Dundee house were in the name of Ruby Hostetler, Gill's mother-in-law. When Quilting began operations in 1979, it operated out of the Dundee house. In 1983, it moved its operations to a manufacturing facility in Zoar, Ohio (the manufacturing facility). The manufacturing facility is located about 20 miles from the Dundee house. Gill found it difficult to live 20 miles away from Quilting's operations because there was a frequent breakdown of equipment at the manufacturing facility that needed repair. Consequently, in 1983, Gill and Bell moved their residence to an unused portion of the manufacturing facility. From 1983 until its sale in April 1989, the Dundee house was used by Quilting to store materials such as cardboard and plastic. The materials stored at the Dundee house were placed on skids on the floor. On August 13, 1986, Gill and Quilting executed a written agreement (Dundee lease), which was retroactive to December 1, 1984, under which *99 Gill agreed to rent the Dundee house to Quilting for three years at $ 100 per month. The Dundee lease required Gill, as the lessor, to pay the property taxes and cost of electricity for the house. In addition, it provided that Quilting, as the lessee, was required to pay "Any damages done to building and property from any person employed by lessee". Shaw drafted and set the terms of the Dundee lease. During Quilting's use of the Dundee house, a skylight in the house was leaking which caused a lot of damage to the house. In addition, a leak in the porch resulted in damage to the lower level of the house. During the years 1986 through 1988, Quilting incurred expenses to (1) replace the roof on the house, (2) repair the heating and plumbing systems, (3) put in new dry wall and trim molding, and (4) remove the skylight. Quilting's expenditures with respect to the Dundee house during those years were $ 4,710.05, $ 13,532.57, and $ 2,821.67, respectively. Quilting claimed depreciation deductions relating to those expenditures in its returns for its taxable years ended April 30, 1987, and April 30, 1988, in the amounts of $ 374 and $ 1,819, respectively. Under the separation agreement *100 between Gill and Bell, Gill received Bell's interest in the Dundee house. In April 1989, the Dundee house was sold for $ 34,000. Gill received all sales proceeds remaining after payment of closing costs and the outstanding mortgage loan balance. On October 10, 1985, Quilting purchased a house in Bolivar, Ohio (the Bolivar house), from Freeman Hostetler, Gill's father-in-law. The purchase price was $ 69,000. At the time of its purchase, the Bolivar house, which is located two to three miles from the manufacturing facility, had a finished first floor and an unfinished second floor. Sometime in 1985, Gill moved from the manufacturing facility into the Bolivar house. On August 13, 1986, Gill and Quilting executed a written agreement (Bolivar lease), which was made retroactive to October 1, 1985, under which Quilting agreed to lease the house to Gill for two years at $ 200 per month. The Bolivar lease required Quilting, as the lessor, to pay the property taxes and cost of electricity for the house. In addition, it provided that Gill, as the lessee, was required to pay for any damage to the property from any person he employed. Shaw drafted and set the terms of the Bolivar lease. *101 Gill did not pay the rent due under the Bolivar lease for any of the years at issue. For its taxable year ended April 30, 1987, Quilting recorded the rent due under that lease by making an accounting entry in the amount of $ 2,400. During its taxable years ended April 30, 1986, 1987, and 1988, Quilting made expenditures relating to the Bolivar house in the amounts of $ 4,940, $ 12,921, and $ 7,780, respectively. These expenditures were for real estate taxes, interest, electricity, repairs and maintenance, building improvements, and land improvements. In its return for each of those years, Quilting deducted those expenditures and claimed depreciation deductions for the Bolivar house. On September 17, 1984, Quilting held a meeting (September 17 meeting) attended by Gill and Bell. At that meeting, it was agreed that, as additional compensation to Gill and Bell, Quilting would contribute the maximum annual amount allowable to individual retirement accounts (IRA) for Gill and for Bell. Shaw kept the minutes of the September 17 meeting. During each of its taxable years ended April 30, 1986, 1987, and 1988, Quilting contributed $ 2,000 to an IRA for Gill. In its income tax return *102 for each of the taxable years ended April 30, 1987, and 1988, Quilting deducted the $ 2,000 contribution it made on Gill's behalf as part of employee benefits. Shaw had also made an adjusting entry for Quilting's taxable year ended April 30, 1985, and allocated to compensation the IRA contribution made by Quilting for that year on behalf of Gill. Quilting did not provide Gill with a Form 1099 for any of the IRA contributions it made during 1986 through 1988. Gill reported as income, but not as a dividend, the IRA contribution for 1988, but not for 1986 or 1987. During each of the years 1986, 1987, and 1988, Quilting paid an annual premium of $ 1,553.50 to Franklin Life Insurance Company (Franklin Life) for certain life insurance policies. Quilting deducted this annual premium as part of employee benefits in its income tax return for each of its taxable years ended April 30, 1987, and 1988. Of the total annual premium of $ 1,553.50, $ 1,011.30 was for a life insurance policy on Gill with Bell as the beneficiary and $ 542.20 was for a policy on Bell with Gill as the beneficiary. [3]Quilting also paid the premiums for certain life insurance policies that it owned on two other employees. *103 Quilting first provided life insurance for one of those employees beginning in 1986. In 1978, Gill raced cars six or seven times over a one-to-two-month period. [4] In 1983, Gill was asked to substitute for another race car driver who was unavailable. Gill agreed to act as a substitute driver, but crashed the car during the race. *104 Gill did not race cars again until a decision was made around the time Bell and Gill separated in 1985 that race car sponsorship would be a good way to publicize Quilting. Gill, who, as the sole officer of Quilting, made all the decisions with regard to Quilting's advertising during the years at issue, concluded that such an advertising program would create a unique image for Quilting because no other company in its industry sponsored race cars. To implement this advertising strategy, Gill personally purchased a blue Camaro (blue Camaro), raced it six or seven times, and sold it after it was wrecked. Thereafter, on June 26, 1986, Gill personally purchased a red Camaro (red Camaro), raced it about eight times, and sold it on September 25, 1986. Also on September 25, 1986, Gill personally purchased a Trans Am (Trans Am) that he raced. Gill reported $ 200 in income from these racing activities in his tax return for 1987. Gill reported gross income from racing activities in his tax return for 1988 in the amount of $ 5,704. During the years 1986 through 1988, Quilting sponsored Gill's race cars. Sometime in 1987, Gene Pringle (Pringle) approached Gill and asked if Quilting would *105 sponsor his car racing activities. Gill and Pringle were unacquainted prior to this contact. Because of Pringle's prior success as a race car driver, Quilting agreed to sponsor Pringle. During the years 1986 through 1988, Gill drove race cars sponsored by Quilting at tracks in various cities in Ohio. [5] The cars were raced during the racing season, which ran from May to September. The name "Quilting Creations" was prominently displayed in large letters on both sides of the race cars sponsored by Quilting. Following a race in 1986, Gill was interviewed by ESPN, a sports television network, but the interview was never broadcast. During 1987 and 1988, Pringle drove a car prominently displaying the name Quilting Creations in a variety of races at tracks in Ohio, at least two of which were broadcast by the national broadcast media. In addition, by displaying a picture of one of the race cars at the trade shows where it marketed its products, Quilting expected and was able to call attention and draw people to its booth at those shows. Gill's racing and business activities were also the subject of a November 1988 article in Craft and Needlework Age, a significant publication in Quilting's *106 industry. The race cars were also mentioned in correspondence during 1989 from customers of Quilting located in Japan and Australia. *107 During the years 1986 through 1988, Quilting paid expenses associated with its race car sponsorship in the amounts of $ 15,319.57, $ 50,602.55, and $ 25,490.23, respectively. For taxable years ended April 30, 1986, 1987, and 1988, Quilting claimed deductions for the following amounts: Taxable
Total
Race Car Sponsorship Claimed
Year Ended
Advertising
As Part of Total Advertising
April 30, 1986
$ 68,105 $ --  April 30, 1987
100,510
30,910
April 30, 1988
236,451
44,252
The $ 30,910 claimed by Quilting for its taxable year ended April 30, 1987, included (1) $ 3,000 with respect to a general purpose trailer (the trailer) that, although used to haul the race cars to the track, was principally utilized to carry business supplies and (2) $ 1,600 with respect to a semitrailer that was used to store materials at Quilting's plant and that was not used in the race car activities. The remainder of that amount (namely, $ 26,310) was attributable to expenses Quilting incurred with respect to the blue Camaro, the red Camaro, and the Trans Am, the three cars it sponsored during that year. Of the $ 44,252 claimed by Quilting for its taxable year ended April 30, 1988, $ *108 3,077 was incurred to sponsor Pringle's race car and the balance was incurred to sponsor the Trans Am. [6]
OPINION
Petitioners bear the burden of proving that respondent's determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In deciding the issues presented herein, we will take into account the testimony of Gill, Bell, and Shaw which, having observed their demeanor at trial, we find credible and forthright. The principal issues in these cases relate to whether, for the *109 respective years at issue, (1) Quilting is entitled to certain deductions, and (2) Gill received constructive dividends as a result of certain expenditures by Quilting. With respect to the deductions claimed by Quilting, the statutory provisions applicable to the contested items are sections 162 and 167. The determination of whether an expenditure satisfies the requirements for deductibility under those provisions is a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943); Southeastern Canteen Co. v. Commissioner, 410 F.2d 615, 622 (6th Cir. 1969), affg. in part and revg. in part T.C. Memo. 1967-183; Quinn v. Commissioner, 65 T.C. 523, 526 (1975). Section 162 generally allows a deduction for ordinary and necessary business expenses. In general, an expense is ordinary under section 162 if it is considered "normal, usual, or customary" in the context of the particular business out of which it arose. Deputy v. du Pont, 308 U.S. 488, 495-496 (1940). Ordinarily, an expense is necessary if it is appropriate and helpful *110 to the taxpayer's trade or business. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985). Even if an expense is ordinary and necessary, it is deductible under section 162 only to the extent it is reasonable in amount. E.g., United States v. Haskel Engineering & Supply Co., 380 F.2d 786, 788-789 (9th Cir. 1967); Commissioner v. Lincoln Electric Co., 176 F.2d 815, 817 (6th Cir. 1949), revg. a Memorandum Opinion of this Court dated Oct. 27, 1947. In deciding whether an expense is ordinary and necessary within the meaning of section 162, courts generally have focused on the existence of a reasonably proximate relationship between the expense and the taxpayer's business and the primary motive or purpose for incurring it. E.g., Greenspon v. Commissioner, 229 F.2d 947, 954-955 (8th Cir. 1956), affg. on this issue 23 T.C. 138 (1954); Henry v. Commissioner, 36 T.C. 879, 884 (1961); *111 Larrabee v. Commissioner, 33 T.C. 838, 841-843 (1960). In general, where an expenditure is primarily associated with profit-motivated purposes, and personal benefit can be said to be distinctly secondary and incidental, it may be deducted under section 162. E.g., International Artists, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970); Sanitary Farms Dairy, Inc. v. Commissioner, 25 T.C. 463, 467-468 (1955); Rodgers Dairy Co. v. Commissioner, 14 T.C. 66, 73 (1950). Conversely, if an expenditure is primarily motivated by personal considerations, no deduction for it will be allowed. E.g., Henry v. Commissioner, supra; Larrabee v. Commissioner, supra.
Section 167 generally allows a depreciation deduction with respect to property used in a trade or business or held for the production of income. In determining whether such a deduction is permitted, courts ordinarily have focused on whether the acquisition and/or maintenance of property was primarily associated with profit-motivated purposes. E.g., *112 International Artists, Ltd. v. Commissioner, supra.
With respect to the constructive dividends determined by respondent, it is well established that when a corporation confers an economic benefit on a stockholder in his or her capacity as such, without an expectation of reimbursement, that benefit constitutes a constructive dividend to the stockholder. E.g., Hagaman v. Commissioner, 958 F.2d 684, 690 (6th Cir. 1992), affg. in part and remanding in part T.C. Memo. 1987-549; Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980). The existence of a constructive dividend is a question of fact. Hagaman v. Commissioner, supra; Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1215 (5th Cir. 1978). With these general principles in mind, we now turn to the issues presented. 1. Dundee House
Gill was the owner of the Dundee house during each of the years at issue. [7]Quilting used the Dundee house from 1983 through April 1989 to store materials such as cardboard and plastic. During the *113 years 1986 through 1988, Quilting incurred expenses to (1) replace the roof on the house, (2) repair the heating and plumbing systems, (3) put in new dry wall and trim molding, and (4) remove the skylight. During those years, Quilting's expenditures relating to the Dundee house were $ 4,710.05, $ 13,532.57, and $ 2,821.67, respectively. Quilting claimed depreciation deductions relating to those expenditures in its returns for its taxable years ended April 30, 1987, and 1988 in the amounts of $ 374 and $ 1,819, respectively. Respondent determined that Quilting's expenditures for improvements to the Dundee house were made for the purpose of benefiting Gill, and not Quilting, and she therefore disallowed the depreciation deductions claimed by *114 Quilting with respect to them. [8] When a corporation incurs expenses to improve property for the primary purpose of benefiting a shareholder, the corporation is not entitled to depreciation deductions with respect thereto. E.g., International Trading Co. v. Commissioner, 275 F.2d 578, 586 (7th Cir. 1960), affg. T.C. Memo. 1958-104; see International Artists, Ltd. v. Commissioner, supra; Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 659 (1962). Petitioners contend that (1) Quilting was required to pay for any damage to the Dundee house during the period Quilting used it, (2) the Dundee house was used in Quilting's trade or business, and (3) therefore Quilting is entitled to depreciation deductions with respect to its expenditures on that house. Contrary to *115 petitioners' position, the Dundee lease executed by Gill and Quilting did not require Quilting to pay for all damage to the Dundee house. Rather, it required Quilting to pay only for damage caused by its employees. The only evidence in the record suggesting that the damage to the Dundee house was caused by a Quilting employee is Gill's testimony that Quilting's failure to heat the house during the winter damaged it. However, Gill also testified that a leak in the skylight caused a lot of damage to the Dundee house and that a leak in the porch caused the damage to the first floor. There is no evidence suggesting that a Quilting employee caused the leaks to the house that resulted in much of the damage. The record is also devoid of evidence establishing that a Quilting employee caused the damage to the roof, the heating system, or the plumbing system. Based on the entire record, we conclude that Quilting's expenditures to repair the Dundee house were made for the primary purpose of benefiting Gill, and not Quilting. See Challenge Manufacturing Co. v. Commissioner, supra.Accordingly, on the present record, we conclude that Quilting is not entitled *116 to the depreciation deductions it claimed for the years at issue with respect to the expenditures it incurred on the Dundee house. Respondent also determined that Quilting's expenditures relating to the Dundee house are constructive dividends to Gill. Petitioners disagree, contending that the value of the Dundee house was not enhanced by the repairs Quilting made to the house and that therefore no economic benefit was conferred upon Gill. As support for their position, petitioners point to the fact that the Dundee house was purchased in 1978 for $ 32,000 and was sold in 1989 for $ 34,000. However, this could have been attributable to a variety of factors, such as the market for similar housing, and does not control whether Gill received an economic benefit from Quilting's expenditures on the Dundee house. Quilting's expenditures on the Dundee house included amounts incurred to replace the roof, to repair the heating and plumbing systems, to put in dry wall and trim molding, and to remove a skylight that was leaking. These expenditures clearly conferred an economic benefit upon Gill as owner of the house. Nothing in the record supports a conclusion that the benefit to Gill was *117 not equal to the amount of Quilting's expenditures, as determined by respondent. Accordingly, based on the record here, respondent's determination that Quilting's expenditures relating to the Dundee house constitute constructive dividends to Gill is sustained. [9]Magnon v. Commissioner, supra at 994; Challenge Manufacturing Co. v. Commissioner, supra at 663. 2. Bolivar House
Quilting purchased the Bolivar house in 1985 from Gill's father-in-law. Sometime in 1985, Gill moved into the house and lived there throughout the years at issue. During its taxable years ended April 30, 1986, 1987, and 1988, Quilting made certain expenditures relating to the Bolivar house in the amounts of $ 4,940, $ 12,921, and $ 7,780, respectively. These expenditures were made for real estate *118 taxes, interest, electricity, repairs and maintenance, building improvements, and land improvements. Quilting deducted currently or claimed depreciation deductions in respect of those expenditures in its returns for the years at issue. Respondent originally disallowed all of those deductions on the ground that the acquisition and maintenance of the Bolivar house benefited Gill, rather than Quilting. After certain concessions, the following amounts of deductions with respect to the Bolivar house, consisting of depreciation and certain other expenses, are in dispute: Taxable Year
Ended Amount April 30, 1986
$ 6,520.00 April 30, 1987
15,622.58
April 30, 1988
11,177.14
Where a corporation acquires and maintains property for the primary purpose of benefiting a shareholder, the corporation is not entitled to deductions under sections 162 or 167 with respect to that property. E.g., International Artists, Ltd. v. Commissioner, 55 T.C. at 104. Quilting claims that its overriding purpose in acquiring and maintaining the Bolivar house was to free up space at its manufacturing facility by providing Gill with a place to live outside of, but *119 near, the manufacturing facility. Respondent contends that Gill received all of the benefits from the Bolivar property and that it was acquired and maintained for Gill's benefit. We agree with respondent. While the need for additional manufacturing space may have required Gill to vacate the manufacturing facility, it did not require Quilting to provide Gill with alternative housing. Indeed, the corporate purpose asserted by Quilting was fulfilled when Gill left the manufacturing facility and was not served in any meaningful way by the acquisition and maintenance of the Bolivar house. The separation agreement between Gill and Bell supports our conclusion that the Bolivar house was acquired and maintained for the primary purpose of benefiting Gill, and not Quilting. That agreement, which is dated 13 days after Quilting purchased the Bolivar house, states that Gill had arranged to acquire the Bolivar house and that Bell had arranged to acquire a separate piece of property equal in value to the Bolivar house. The agreement further provides that Gill "shall own, have and enjoy" the Bolivar house "as his separate property" and that agreement further provides that Gill was to acquire *120 all of the stock in Quilting. These provisions in the separation agreement suggest that the primary consideration in acquiring the Bolivar house was Gill's separation from Bell, and not a corporate purpose of Quilting. On the instant record, we conclude that Quilting's acquisition and maintenance of the Bolivar house was motivated primarily for the personal benefit of Gill and that any benefit to Quilting was merely incidental. International Trading Co. v. Commissioner, 275 F.2d at 586; Challenge Manufacturing Co. v. Commissioner, 37 T.C. at 659. Accordingly, we conclude that, except as conceded by respondent, the expenditures incurred by Quilting with respect to the Bolivar house are not deductible under either section 162 or section 167.[10]
*121 3. IRA Contributions and Life Insurance Premiums
During each of its taxable years ended April 30, 1986, 1987, and 1988, Quilting contributed $ 2,000 to an IRA on behalf of Gill. Quilting deducted the $ 2,000 payment as part of employee benefits for each of its taxable years ended April 30, 1987, and 1988. Quilting paid $ 1,553.50 to Franklin Life for life insurance on Gill and Bell during each of the years 1986 through 1988. Of the $ 1,553.50 paid to Franklin Life each year, $ 1,011.30 was for a policy on Gill with Bell as the beneficiary and $ 542.20 was for a policy on Bell with Gill as the beneficiary. For each of its taxable years ended April 30, 1987, and 1988, Quilting claimed a deduction as part of employee benefits for the amounts it incurred from 1986 through 1988 to provide Gill and Bell with life insurance. Respondent determined that the IRA contributions made on behalf of Gill and the life insurance premiums Quilting paid for policies on Gill and Bell are not deductible by Quilting and that those expenditures constitute constructive dividends to Gill. Gill concedes that his income includes the IRA contributions and the amounts Quilting expended in providing *122 him with life insurance. Gill disputes respondent's determination that Quilting's payment of the cost of providing Bell with life insurance resulted in income to him. [11] Petitioners contend that the IRA contributions and the insurance premiums are deductible by Quilting as additional compensation. *123 The basic inquiry governing the proper characterization of the amounts at issue is whether they were incurred by Quilting with the intent to compensate Gill and Bell. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 514 (1992). The presence of an intent to compensate is a question of fact. Id.
Gill testified that the IRA payments were intended to be additional compensation. Petitioners submitted into evidence minutes of the September 17 meeting at which it was agreed that, as additional compensation to Gill and Bell, Quilting would contribute to an IRA for Gill and Bell the maximum annual amount allowable. [12]
Gill also testified that it was the policy of Quilting to provide life insurance to all of its key employees as a means of providing them with additional compensation. Gill explained that Quilting *124 provided life insurance to two of its employees in addition to himself and Bell and that one of those employees had been receiving life insurance coverage since 1986. Based on the present record, we believe that petitioners have demonstrated that the IRA contribution made by Quilting on behalf of Gill in each of its taxable years ended April 30, 1986, 1987, and 1988 was intended to be compensation to Gill and that the life insurance premiums paid by Quilting from 1986 through 1988 on policies insuring the lives of Gill and Bell were intended by Quilting to constitute additional compensation to Gill and Bell, respectively. Accordingly, we conclude that those amounts are deductible by Quilting as ordinary and necessary compensation expenses under section 162. Because Gill conceded that the IRA contributions made by Quilting on his behalf in its taxable years ending April 30, 1986, 1987, and 1988 and premium payments on the policy insuring his life made by Quilting from 1986 through 1988 were includible in his income, there remains only the question whether the premiums paid by Quilting on the policy insuring Bell's life during those years are includible in Gill's income. [13]
*125 Our holding that Quilting is entitled to deduct as additional compensation to Gill and to Bell the respective life insurance premiums it incurred for policies on each of them also disposes of respondent's determination that Quilting's payment of the cost of insuring Bell's life resulted in a constructive dividend or additional compensation to Gill. [14] A corporate expenditure may constitute a constructive dividend only if it does not give rise to a deduction on behalf of the corporation. P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th Cir. 1987), affg. T.C. Memo. 1984-549. Accordingly, we conclude that Quilting's payments of premiums on the policy insuring Bell's life do not constitute constructive dividends to Gill. We further conclude that these payments do not constitute additional compensation to Gill. This is because we have found that they are additional compensation to Bell. *126 4. Race Car Sponsorship
During its taxable years ended April 30, 1987, and 1988, Quilting incurred expenses of $ 30,910 and $ 44,252, respectively, to sponsor certain race car activities.[15] Section 162 allows a deduction for the ordinary and necessary expenses incurred in carrying on a trade or business. In order to show that the cost of its race car sponsorship is an ordinary and necessary expense, Quilting must establish that the sponsorship was proximately related to Quilting's business. Henry v. Commissioner, 36 T.C. at 884. To do this, Quilting must show that its race car sponsorship was reasonably calculated to advertise that business. E.g., Schulz v. Commissioner, 16 T.C. 401, 407 (1951); see also Snow v. Commissioner, 31 T.C. 585, 592 (1958). Moreover, the claimed advertising purpose must not be merely a "thin cloak for the pursuit of a hobby" by Gill. Rodgers Dairy Co. v. Commissioner, 14 T.C. at 73; see Challenge Manufacturing Co. v. Commissioner, 37 T.C. at 658-659. *127 We will consider first whether Quilting's race car sponsorship was reasonably calculated to advertise Quilting and was therefore proximately related to its business. If we find for Quilting, we will decide whether the amounts incurred for such sponsorship were reasonable. It is respondent's position that the race car sponsorship was instituted primarily for the personal benefit of Gill and conferred only an incidental benefit on Quilting. Respondent advances a number of contentions to support her position. We have considered all of them and find none to be persuasive. Respondent appears to be most troubled by Quilting's claim to deductions for its race car sponsorship because racing appears to be an enjoyable activity for Gill. [16] However, respondent concedes that the mere fact that Gill found racing pleasurable will not prevent Quilting from deducting the cost of its race car sponsorship, provided that the primary purpose of that sponsorship was to benefit Quilting by advertising its business. Sanitary Farms Dairy, Inc. v. Commissioner, 25 T.C. at 467. *128 Based on the entire record, we find that the race car sponsorship was instituted primarily for Quilting's benefit and had only incidental benefits for Gill. We note that Gill had very limited experience in 1978 and 1983 in car racing before 1986 (his first taxable year at issue) and went back into it only after deciding that it would be a good way to publicize Quilting. We also find it significant that respondent does not point to any evidence, and we have found none, that shows Gill derived any personal benefit from Quilting's sponsorship of Pringle. Quilting's willingness to sponsor Pringle, with whom Gill had had no contact prior to the time that Pringle approached Quilting to seek its sponsorship, indicates to us that Quilting regarded its race car sponsorship as a bona fide, albeit unconventional, method for publicizing its business. Indeed, it was the unusual nature of this publicity that led Quilting to conclude that it would create a unique image for itself in its industry -- an image that Quilting expected would distinguish it from its competitors and promote its business. [17] Moreover, by displaying a picture of one of the race cars at the trade shows where it marketed *129 its products, Quilting expected, and was able, to call attention and draw people to its booth at those shows. [18]
The cars sponsored by Quilting were raced by Gill and Pringle at various tracks in Ohio. The cars ran during the racing season, which lasted from May to September. The name Quilting Creations was prominently displayed on both sides of the race cars. In 1986, Gill was interviewed by ESPN, a national sports network. *130 Although the interview was never broadcast, the fact that it occurred indicates that Quilting's race car sponsorship had the potential to provide national exposure for Quilting. During the time Quilting sponsored Pringle, he drove a car prominently displaying the name Quilting Creations in at least two races that were broadcast by the national media. Quilting obtained further publicity from its race car sponsorship when an article about Quilting and the car racing activities appeared in the November 1988 issue of Craft and Needlework Age, a significant publication within Quilting's industry. Furthermore, the race cars sponsored by Quilting were occasionally mentioned by Quilting's customers in their correspondence with Quilting during 1989, indicating that the race car sponsorship aided in producing favorable publicity and a distinctive image for Quilting. It is significant that these letters came from customers in Japan and Australia, showing that word of Quilting's promotional program had even spread overseas. While the article in Craft and Needlework Age and the letters from customers were written shortly after the years at issue, this circumstance does not render them irrelevant. *131 A promotional activity does not have to produce an immediate effect in order for its cost to be considered a legitimate business expense. Based on the record here, we conclude that Quilting viewed the race car sponsorship as a long-term promotional program. Quilting seemed willing to sponsor Gill's and Pringle's car racing based on the prospect of future promotional benefits to it, and the record establishes that the expected benefits were beginning to materialize. Respondent argues that petitioners have not identified any one sale that can be attributed to Quilting's race car sponsorship. Quilting's failure to point to specific additional sales is not necessarily fatal to its case. Moreover, we conclude from the instant record that the race car sponsorship by Quilting was not intended to generate sales immediately. Rather, it was expected to publicize Quilting by creating a unique image for it, thereby helping to generate sales in the future. Respondent also points out that only 10 percent of Quilting's customers were located in Ohio where the cars it sponsored were raced. However, the record does not support respondent's premise, and Quilting does not contend, that it expected *132 the principal benefit of its race car sponsorship to be derived from placing its name before those people who attended those races. Based on that record, we find that Quilting intended to benefit from the publicity given the races by the media (comprising the local media in Ohio and the national and international media) that covered them. Thus, the fact that only a relatively small percentage of Quilting's actual or prospective customers had the opportunity to view in person the cars sponsored by Quilting does not necessarily establish that Quilting's sponsorship was primarily intended to benefit Gill. The letters in the record show that word of the race car sponsorship was widely disseminated among Quilting's customers. We have not required promotional activities like those at issue here to take place at a venue accessible to a majority of a business' customers in order for their cost to be deductible. See Rodgers Dairy Co. v. Commissioner, 14 T.C. at 72-73. Moreover, the record shows that Quilting's sales in Ohio increased substantially during the years at issue, suggesting that Quilting could well have realized some benefit in Ohio from exposure *133 of its name at the racetracks. Respondent further contends that the fact that Quilting's race car sponsorship was not mentioned in its craft magazine advertising and catalogs during the years at issue and did not substitute for conventional forms of advertising supports her position. We disagree. Quilting sought to distinguish itself from its competitors by developing a unique image in its industry and creating a device to attract potential customers to its booth at trade shows through the publicity that it expected to obtain by its race car sponsorship. We do not believe that these benefits would have been readily obtainable through conventional advertising. Quilting's race car sponsorship seems to us to be a supplement to its conventional advertising. Based on our consideration of the entire record, we conclude that Quilting's race car sponsorship was reasonably calculated to gain publicity for Quilting that would allow it to distinguish itself from its competitors and that that sponsorship was expected to provide Quilting with more than incidental benefits. We thus find that Quilting's race car sponsorship was undertaken primarily for Quilting's benefit and was proximately *134 connected to its business, as required by section 162. Therefore, we are not prepared to disallow entirely the deductions claimed by Quilting for the expenses incurred for that sponsorship. Nonetheless, in order to sustain its tax return position, Quilting must still establish that the deductions it claimed are reasonable in amount. See United States v. Haskel Engineering & Supply Co., 380 F.2d at 788. In deciding whether the amount of a deduction is reasonable, courts have, when appropriate, resorted to an arm's-length standard and have held an amount unreasonable if it is greater than the amount that would have been negotiated between parties dealing at arm's length. E.g., Audano v. United States, 428 F.2d 251, 256 (5th Cir. 1970); Southeastern Canteen Co. v. Commissioner, 410 F.2d at 619-620. We find it appropriate in the present case to look to the arm's-length standard that is disclosed in the record. Although Quilting's sponsorship of race cars was unique in its industry, there is evidence in the record indicating the amount that Quilting would have paid to sponsor race cars in *135 an arm's-length transaction, namely, the amount incurred by Quilting to sponsor Pringle's race car activities that is also at issue in this case. [19] Based on the present record, we find that the expense incurred by Quilting during its taxable year ended April 30, 1988, to sponsor Pringle's activities (i.e., $ 3,077) was reasonable. We therefore sustain Quilting's deduction of that amount. The expenses incurred by Quilting to sponsor Pringle's race cars contrast markedly with the $ 26,310 [20] and the $ 41,175 incurred by Quilting with respect to Gill's race car activities during its taxable years ended April 30, 1987, and 1988, respectively. We conclude that the expenses incurred by Quilting to sponsor Gill's race cars were excessive in relation to the benefits *136 reasonably expected to be obtained in return. If Quilting considered the advantages afforded by sponsoring Pringle's car to have been worth about $ 3,000, the record does not explain why Quilting would have needed to incur so much additional expense in order to obtain essentially the same type of benefits from sponsoring Gill's race cars. [21]
*137 Where a taxpayer establishes his or her entitlement to a deduction, but does not establish the amount of that deduction, we are permitted to estimate the amount allowable. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); see Cinelli v. Commissioner, 502 F.2d 695, 699 (6th Cir. 1974), affg. T.C. Memo. 1973-140. However, there must be sufficient evidence in the record to permit us to conclude that deductible expenses were incurred in at least the amount allowed; otherwise "relief to the taxpayer would be unguided largesse." Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); see also Luman v. Commissioner, 79 T.C. 846, 859 (1982). We must also explain the method used to arrive at our estimate. Concord Control, Inc. v. Commissioner, 615 F.2d 1153, 1156 (6th Cir. 1980), remanding on this ground T.C. Memo. 1976-301. As noted above, we have found the amount of Quilting's sponsorship of Pringle (namely, $ 3,077) to be an arm's-length amount that qualifies *138 as an ordinary and necessary expense under section 162. We therefore will use that amount as the basis for estimating the deduction allowable for Quilting's sponsorship of Gill's race cars. The sponsorship of Pringle does not appear to have extended over more than one of Quilting's taxable years, and, although it is not clear from the record, it appears that Pringle had only one car that he raced. Consequently, we will allow Quilting a deduction of $ 3,077 for each car that Gill raced during each of its taxable years ended April 30, 1987, and April 30, 1988. We have found from the record that Gill raced three cars (a blue Camaro, a red Camaro, and a Trans Am) during the former year and one car (a Trans Am) during the latter year. Accordingly, Quilting will be allowed to deduct race car sponsorship expenses of $ 9,231 for its taxable year ended April 30, 1987, and $ 6,154 [22] for its taxable year ended April 30, 1988. Because Quilting *139 included as part of its advertising expense deduction for its taxable year ended April 30, 1987, certain amounts with respect to two trailers it used during that year, we must also decide whether those amounts are deductible. Most of those amounts do not even relate to Quilting's race car sponsorship or its other advertising during that year. Thus, it appears to us that most of those expenses were misclassified in Quilting's tax return for that year. Quilting claimed a $ 3,000 deduction with respect to the trailer that was used primarily to carry business supplies. Only a relatively small part of its use was connected with Quilting's race car sponsorship. We have already allowed Quilting to deduct what we have found to be a reasonable amount for its race car sponsorship for its taxable year ended April 30, 1987. Petitioners have not established that any additional deduction is warranted based on the use of the trailer in connection with that sponsorship. Therefore, we will allow a deduction only with respect to Quilting's use of the trailer to haul its business supplies. At trial, Gill testified that the trailer was used throughout the year to transport business supplies for *140 Quilting and was used to haul race cars one day of the week during the racing season. Using our best judgment, and based on all the evidence in the record, we find that 90 percent of the $ 3,000 deduction claimed for the trailer is allocable to the former use and 10 percent is allocable to the latter use. Cohan v. Commissioner, supra. Accordingly, Quilting is entitled to deduct $ 2,700 with respect to the trailer for its taxable year ended April 30, 1987. Quilting also claimed a $ 1,600 deduction with respect to a semitrailer that was used exclusively to store materials at Quilting's plant and was not used in connection with its race car sponsorship. We therefore conclude that Quilting is entitled to the full amount of that deduction for its taxable year ended April 30, 1987. Having concluded that the amounts related to Quilting's race car sponsorship and to the trailer and semitrailer are deductible in part, we hold that Gill did not receive constructive dividends in respect of the deductions we have allowed. [23]P.R. Farms, Inc. v. Commissioner, 820 F.2d at 1088. *141 We must further decide whether the remaining amounts claimed as race car sponsorship expenses for which we have allowed no deductions constitute constructive dividends to Gill. See id. We conclude that such amounts, including the $ 300 amount disallowed with respect to the trailer, [24] are constructive dividends to him for his years at issue during which they were paid. The amounts we have disallowed consist of expenses incurred by Quilting with respect to race cars owned by Gill. Quilting thus conferred a benefit on Gill in those amounts. Greenspon v. Commissioner, 23 T.C. at 150-151. *142 We note that Gill, as an individual, was on the cash method of accounting during the years at issue. Quilting was on the accrual method. They had different taxable years: Gill had a calendar taxable year and Quilting had a taxable year ending April 30. In making her determinations in the notice of deficiency issued to Gill, respondent did not simply include in Gill's income for each of his taxable years at issue the disallowed race car sponsorship expenses claimed by Quilting for each of its taxable years that ended in each such year. Rather, it seems to us that respondent included in Gill's income disallowed expenses for each of his taxable years during which Quilting paid such expenses. In order to permit calculation of the amount of Gill's constructive dividends for each of his taxable years at issue, we will first make findings as to when Quilting should be treated as having paid the amounts we have allowed it to deduct as race car sponsorship expenses. The constructive dividends determined by respondent for each of Gill's years at issue should then be reduced by the allowed amount of race car sponsorship expenses so treated as having been paid during each such year. For *143 purposes of calculating the amount of expenses related to Gill's race cars to be included in Gill's income for each of his taxable years at issue, we find that the expenses we have allowed Quilting to deduct for its race car sponsorship for each of its taxable years ended April 30, 1987, and April 30, 1988, were paid by Quilting over the period consisting of May to September of each of the calendar years 1986 and 1987, respectively, which were the 1986 and 1987 car racing seasons. We further conclude that those permitted expenses will reduce the constructive dividends that respondent determined Gill received in each of those calendar years. The amount of constructive dividends respondent determined Gill received in 1986 and 1987 must also be reduced by the amount we have allowed Quilting to deduct with respect to the trailer and the semitrailer. In this connection, we will treat Quilting's payment of expenses connected with the trailer and the semitrailer as having occurred ratably over the period of their use throughout Quilting's taxable year ended April 30, 1987. The portion of the $ 3,000 expense related to the trailer that we have not allowed Quilting to deduct (namely, $ *144 300) will be treated as having been paid over the course of May to September 1986, i.e., over the 1986 car racing season. Respondent's determination of the amount of constructive dividends Gill received in each of the years 1986 and 1987 must therefore be reduced by the amount of the expenses that we have allowed Quilting to deduct with respect to the trailer (namely, $ 2,700) and the semitrailer (namely, $ 1,600) and that we have treated as having been paid in each of those years. The balance of the constructive dividends determined by respondent for each of Gill's taxable years remaining after the foregoing adjustments are taken into account will be sustained. 5. Additions to Tax for Negligence
Respondent determined that Gill is liable for the additions to tax under section 6653(a)(1)(A) and (B) for 1986 and 1987 and the addition to tax under section 6653(a)(1) for 1988. Respondent also determined that Quilting is liable for the additions to tax under section 6653(a)(1)(A) and (B) for each of its taxable years at issue. [25] Section 6653(a)(1)(A) (section 6653(a)(1) for Gill's 1988 taxable year) imposes an addition to tax equal to five percent of the underpayment of tax *145 if any part of that underpayment is due to negligence. Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Respondent determined that the entire amount of Gill's underpayment for each of the years 1986 and 1987 was due to negligence and that the entire amount of Quilting's underpayment for each of its taxable years at issue was due to negligence. Negligence, for purposes of section 6653(a), has been defined as a lack of due care or a failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Neely v. Commissioner, 85 T.C. 934, 947 (1985). *146 The general rule is that the duty to file an accurate return cannot be avoided by placing responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974). However, it is well settled that a taxpayer may avoid the additions to tax for negligence by demonstrating reasonable reliance on the advice of a professional or expert. Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.    , 111 S. Ct. 2631 (1991); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). In the case of claimed reliance on an accountant who prepared the taxpayer's return, the taxpayer must establish that the correct information was provided to the accountant and that the item incorrectly claimed or reported in the return was the result of the accountant's error. Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); *147 Enoch v. Commissioner, 57 T.C. 781, 803 (1972). Gill has an eleventh grade education and no training or work experience in the tax field. Gill testified that he and Quilting relied entirely on their accountant, Shaw, in filing income tax returns for the years at issue. Shaw prepared, or at least worked on and reviewed, each of the returns filed by Gill and Quilting for each of those years. Shaw testified that he believed that Quilting was entitled to the deductions it claimed in its returns for its taxable years at issue with respect to the Dundee house and that he believed the amounts expended by Quilting on that house did not constitute constructive dividends to Gill. While we do not agree with Shaw's conclusions, we find there was some, albeit not a very strong, basis for them. Accordingly, we believe that Quilting reasonably relied on Shaw's advice in claiming the deductions regarding the Dundee house and that Quilting was not negligent with respect to those items. We similarly find that Gill reasonably relied on Shaw's advice in not reporting Quilting's expenditures on the Dundee house as constructive dividends and that Gill was not negligent *148 in failing to report those expenditures as constructive dividends. Shaw also testified that, in preparing or reviewing Quilting's returns, he believed that the deductions claimed with respect to the Bolivar house were properly deductible by Quilting. We find that Quilting reasonably relied on Shaw's advice and that Quilting was not negligent in erroneously claiming the deductions for the Bolivar house. Gill concedes that his use of the Bolivar house constituted a constructive dividend in the amount of $ 3,600 for each of the years at issue and that he failed to report that dividend for each such year. We infer from this concession that Gill did not pay the rent due under the lease for any of the years at issue. Shaw's testimony concerning Gill's failure both to pay the rent under the lease and to report his use of the house as income in his return was vague and confusing. There is no evidence establishing that Gill informed Shaw that he had not paid the rent due for the Bolivar house. Based on the record presented, we are unable to conclude that Gill's failure to report his use of the Bolivar house in his return was due to an error by Shaw or that Gill provided Shaw with all *149 of the relevant information concerning that matter. Ma-Tran Corp. v. Commissioner, supra; Enoch v. Commissioner, supra.Gill has not offered any other evidence to establish that his failure to report his use of the Bolivar house as income was not due to negligence. Accordingly, we sustain respondent's determination that Gill's failure to report his use of the Bolivar house as a constructive dividend for each of the years 1986 through 1988 was due to negligence. Respondent determined an adjustment to Quilting's cost of goods sold for its taxable year ended April 30, 1988, which Quilting has conceded. Shaw testified that the adjustment related to a change in the applicable tax law which became effective in 1986. Shaw admitted that he was aware of the change in the law but that he assumed, albeit incorrectly, that the change was taken into account in the inventory figures which he received from Quilting. However, Quilting supplied Shaw with erroneous information that Shaw used to prepare Quilting's return. Since the underpayment resulted from the erroneous data supplied to Shaw by Quilting, and Quilting has *150 not shown that it was not negligent in preparing and furnishing those data to Shaw, we sustain respondent's determination with respect to the underpayment resulting from this error. Enoch v. Commissioner, supra.
Respondent also determined that Gill failed to report the IRA contributions for his taxable years 1986 and 1987, and Gill has conceded that determination. Although Gill reported all of the income reflected on the Forms W-2 issued by Quilting for each of the years 1986 and 1987, the IRA contributions were not reflected on those forms. Nor did Quilting issue any Forms 1099 with respect to those contributions. Because Quilting intended those payments to be compensation to Gill, Quilting should have reported them on the Forms W-2 issued to Gill. Gill claims that the omission of the IRA contributions was a result of Shaw's failure to include them in the gross income reported in his returns. Neither Quilting nor Gill, however, supplied Shaw with information concerning the IRA contributions made on Gill's behalf by Quilting in those years. At trial, Shaw testified that he assumed those contributions were included in the payroll sheets Quilting *151 prepared with respect to Gill, which he did not see. Shaw further testified that he saw only the Forms W-2 furnished by Quilting, which he assumed had been correctly prepared. Accordingly, Gill cannot use his reliance on Shaw to shield himself from the additions to tax for negligence. Enoch v. Commissioner, 57 T.C. at 803. Gill also argues that Shaw was nonetheless aware of the IRA contributions, and Gill thus reasonably relied on him to see that they were properly treated in his return. The record shows that Shaw was aware of the IRA payments and was personally familiar with Quilting's accounting practices with respect to the IRA contributions. Shaw kept the minutes of the September 17 meeting at which it was decided that Quilting would make contributions to IRA accounts on behalf of Gill and Bell in 1984 and subsequent years. Furthermore, Shaw prepared or reviewed Quilting's returns in which those contributions were deducted as part of employee benefits. While Gill might have been able to show the omission from his income of the 1986 and 1987 IRA contributions was not negligent if Shaw had advised him that those contributions were not includible *152 in his income, that is not the situation presented here. Shaw was fully aware that the IRA contributions were taxable to Gill. Indeed, he included the 1985 and 1988 IRA contributions in Gill's gross income. Shaw's failure to include the IRA contributions for 1986 and 1987 resulted from Quilting's failure to report them in the Forms W-2 which it provided to Gill for each of those years. While Shaw's reliance on the erroneous Forms W-2 issued by Quilting in preparing Gill's 1986 and 1987 returns might have been understandable if Shaw had not been familiar with Quilting's affairs, Shaw not only knew of the payments but also had made an adjusting entry for the year ended April 30, 1985, and allocated as compensation to Gill Quilting's IRA contribution for that year. The failure to include Quilting's 1986 and 1987 IRA contributions in Gill's gross income was due in part to Shaw's failure to check whether the appropriate accounting entries had been made by Quilting, as he had done in the prior year. While Quilting's failure to include the IRA contributions in Gill's Forms W-2 for 1986 and 1987 was the principal reason those amounts were not reported in Gill's return, Shaw should also *153 have checked whether they were included, given his high degree of familiarity with Quilting's accounting practices and his view that the IRA contributions were additional compensation to Gill. Accordingly, we sustain respondent's determination that the omission from Gill's 1986 and 1987 returns of the IRA contributions was due to negligence. See American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1117 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). Shaw further testified that he believed that Quilting was entitled to the deductions it claimed in its returns for its taxable years at issue with respect to its race car sponsorship. We believe that Quilting reasonably relied on Shaw's advice in claiming the entire amount of those deductions and that Quilting was not negligent with respect to that tax return treatment. We also find that Gill reasonably relied on Shaw when Gill filed his tax returns for the years at issue and did not include therein any expenditures incurred by Quilting for its race car sponsorship. Petitioners did not present any evidence concerning the other items at issue that they have conceded. *154 Therefore, there is no basis for the Court to determine whether the underpayment resulting from those items was not the result of negligence. Accordingly, we conclude that petitioners have not sustained their burden of proving that the remaining portion of the respective underpayment of Gill and of Quilting for each of the years at issue was not due to negligence. We have found that a portion of Gill's underpayment for each of the years at issue was due to negligence. Accordingly, we conclude that Gill is liable for the addition to tax under section 6653(a)(1)(A) for 1986 and 1987 and under section 6653(a)(1) for 1988. We further conclude that Gill is liable for the addition to tax under section 6653(a)(1)(B) on that portion of the underpayment for each of the years 1986 and 1987 that we have found is attributable to negligence. We have also determined that a portion of Quilting's underpayment for its taxable years ended April 30, 1986, 1987, and 1988 was due to negligence. We therefore conclude that Quilting is liable for the addition to tax under section 6653(a)(1) for its taxable year ended April 30, 1986, and under section 6653(a)(1)(A) for each of its taxable years ended *155 April 30, 1987, and 1988. We further conclude that Quilting is liable for the addition to tax under section 6653(a)(2) for its taxable year ended April 30, 1986, and under section 6653(a)(1)(B) for each of its taxable years ended April 30, 1987, and 1988, on that portion of the underpayment for each of those years that we have found is attributable to negligence. 6. Addition to Tax for Substantial Understatement of Income Tax
Respondent determined that Gill is liable for the addition to tax under section 6661(a) for 1986 through 1988 and that Quilting is liable for that addition for each of its taxable years ended April 30, 1987, and 1988. Section 6661, in general, imposes an addition to tax in the amount of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is generally defined as the amount by which the taxpayer's correct tax exceeds the reported tax. Sec. 6661(b)(2). An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $ 5,000 ($ 10,000 in the case of a corporation). Sec. 6661(b)(1)(A). Petitioners do not argue that the treatment of items causing their *156 respective understatements for the years at issue was adequately disclosed in their returns or that there was substantial authority for the treatment of those items. [26] We therefore conclude that petitioners have conceded those points. See Rybak v. Commissioner, 91 T.C. 524, 566 (1988). Petitioners' only argument against imposition of the addition to tax imposed by section 6661 is that respondent abused her discretion in failing to waive it. In this connection, section 6661(c) allows respondent to waive all or part of the addition to tax under section 6661 upon a showing by the taxpayer *157 that there was reasonable cause for the understatement and that the taxpayer acted in good faith. The regulations under section 6661 provide: In making a determination regarding waiver of the penalty under section 6661, the most important factor * * * will be the extent of the taxpayer's effort to assess the taxpayer's proper tax liability under the law. * * * In addition, circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer. * * * Reliance on an information return or on the advice of a professional (such as an appraiser, an attorney, or an accountant) would not necessarily constitute a showing of reasonable cause and good faith. Similarly, reliance on facts that, unknown to the taxpayer, are incorrect would not necessarily constitute a showing of reasonable cause and good faith. Reliance on an information return, professional advice, or other facts, however, would constitute a showing of reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * * *158 [Sec. 1.6661-6(b), Income Tax Regs.]
Section 6661 does not state that the taxpayer's proof of reasonable cause and good faith will excuse the taxpayer from being held liable for the addition to tax imposed by that provision. Rather, the statute provides that respondent may waive imposition of that addition in cases in which she determines that the taxpayer's failure was due to reasonable cause and was premised on good faith. Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). Respondent's judgment and ability to provide uniform treatment to similarly situated taxpayers deserves our deference, and we should not generally substitute our judgment for hers. Mailman v. Commissioner, supra; Casalina Corp. v. Commissioner, 60 T.C. 694, 701 (1973), affd. per curiam 511 F.2d 1162 (4th Cir. 1975). Nevertheless, we will not sustain respondent's determination of the additions to tax under section 6661 if we conclude that she has exercised her discretion arbitrarily, capriciously, or without a sound basis in fact. Karr v. Commissioner, 924 F.2d 1018, 1026 (11th Cir. 1991), *159 affg. Smith v. Commissioner, 91 T.C. 733 (1988); Mailman v. Commissioner, supra. Thus, the question for the Court is not whether petitioners' respective understatements were due to reasonable cause and were premised on good faith within the meaning of section 6661(c), but rather whether respondent abused her discretion under that section in failing to waive the addition to tax. Petitioners argue that they satisfied the criteria for waiver of the addition because their respective understatements resulted from their reliance on an accountant to prepare their returns for the years at issue. However, petitioners have not placed in the record documentation or other evidence establishing that they submitted to respondent at any time during their dealings with her representatives at the administrative level, or even up to the time of trial, information relating to their reliance on an accountant that would show there was reasonable cause for those understatements and that they acted in good faith. Thus, assuming arguendo that petitioners requested a waiver that respondent refused to grant, [27] the instant record cannot *160 support a finding by us that respondent abused her discretion. Consequently, the addition to tax under section 6661(a) will be imposed if, after making the Rule 155 computations, petitioners' respective understatement of income tax for each of the years at issue for which respondent determined that the addition to tax under section 6661 applies is substantial within the meaning of that section. Mailman v. Commissioner, supra.
Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. At the time of their separation, Gill and Bell owned 49 shares and 51 shares, respectively, of the common stock of Quilting.↩
3. It is not clear from the record who owned the life insurance policies on Gill and/or Bell.↩
4. Gill testified that he first raced in 1976 and did not race again until 1983. Bell testified that Gill raced in 1978 for a brief period shortly after she and Gill were married. We conclude from the entire record that Gill and Bell were referring to the same racing activities when they testified and that Gill first raced in 1978. In this regard, we note that petitioners' counsel advised the Court at trial that Gill had just learned that his mother had lung cancer and that Gill was disoriented and confused as to certain dates.↩
5. The stipulations of the parties refer to two race cars. However, Gill testified that he drove three race cars during the years at issue, but that he never owned more than one at any time. When Pringle's car is taken into account, Quilting sponsored a total of four race cars during certain years at issue. Quilting, however, never sponsored more than two cars at any one time during that period. It is not clear to us whether the stipulations were intended to refer to the total number of race cars sponsored by Quilting (namely, four) or to the number of cars sponsored by Quilting at any one time during certain years at issue (namely, two). While we are not bound by a stipulation clearly contrary to facts disclosed by the record, Jasionowski v. Commissioner, 66 T.C. 312, 318↩ (1976), in order to harmonize the stipulations with the evidence received at trial, we interpret the stipulations to refer to the number of cars sponsored by Quilting at any one time (namely, two) during certain years at issue.
6. Shaw testified that Quilting incurred expenses of $ 42,175 to sponsor Gill during this year, but, when this figure is added to the $3,077 Quilting incurred to sponsor Pringle, the sum is $ 45,252, and not the $ 44,252 amount the parties stipulated Quilting incurred sponsoring race cars during its taxable year ended April 30, 1988. We conclude that Shaw misspoke in testifying to the cost Quilting incurred in sponsoring Gill's race car during that year.↩
7. Following Gill's and Bell's separation in 1985, Gill received Bell's interest in the Dundee house. Thus, when that house was sold in April 1989, Gill received all the proceeds from the sale remaining after payment of closing costs and the outstanding mortgage loan balance.↩
8. Neither party contends that Quilting's expenditures on the Dundee house should have been expensed rather than depreciated.↩
9. There is no suggestion by petitioners that Gill did not receive constructive dividends during the years at issue because Quilting's earnings and profits were inadequate.↩
10. Respondent determined that Gill received a constructive dividend equal to $ 3,600 for each year at issue with respect to Quilting's expenditures on the Bolivar house. Gill conceded the correctness of respondent's determination.↩
11. We note that there appears to be some confusion as to the extent of Gill's concession that the life insurance premiums paid by Quilting are includible in his income. In the stipulation of facts (stipulation) filed at the beginning of the trial, Gill conceded that the premiums paid for insurance on his life were includible in his income, but he did not make a similar concession as to the amounts paid to insure Bell's life. At the beginning of the trial, in outlining for the Court the points no longer in dispute, counsel for petitioners stated there was no dispute as to the income to Gill, but only with respect to the deductibility of the payments by Quilting. Respondent's counsel then stated that she understood that the life insurance issue, as far as it concerned the question whether Quilting's premium payments were includible in Gill's income, was being conceded in full by Gill. Petitioners' brief follows the stipulation, while respondent's brief proceeds on the assumption that Gill conceded that the entire amount of premiums paid for insurance on the lives of both Gill and Bell was includible in his income. Based on our review of the record, we find that Gill's counsel did not intend to make any concession beyond that contained in the stipulation. Accordingly, we conclude that the question whether Gill received a constructive dividend or additional compensation on account of Quilting's payments to insure Bell's life is still in dispute.↩
12. Although Quilting made such contributions on behalf of Gill, the record does not disclose whether Quilting made any such contributions on behalf of Bell.↩
13. Respondent did not determine that any IRA contributions made by Quilting on Bell's behalf constituted income to Gill.↩
14. Although it is not altogether clear, it appears, and we assume herein, that respondent is taking the position that Quilting's premium payments on the policy insuring Bell's life constitute additional compensation to Gill, even if they are not constructive dividends to him.↩
15. The parties stipulated to a number of exhibits relating to the race car sponsorship issue, subject to certain objections by respondent. Respondent objected to admission of certain of these exhibits on relevance grounds. Two of the exhibits are letters written in 1989 by customers of Quilting that mention the race cars sponsored by Quilting. We find these letters relevant to the race car sponsorship issue, and we thus do not sustain respondent's objection. We shall rely on those letters to the extent stated herein. The remaining two exhibits to which respondent made relevance objections concern stencils made by Quilting for use by Volvo GM Heavy Truck Company to mark shipping crates. We also find these exhibits relevant, but we do not rely on them in reaching our decision. At trial, the parties disagreed as to the admissibility of two other exhibits offered by petitioners that relate to the race car sponsorship issue. Respondent objected to these exhibits on grounds of hearsay. We conditionally admitted those exhibits and indicated that we would address the question of their admissibility in our opinion. Those exhibits consist of articles that were published after the years at issue concerning the use of race car sponsorship to advertise various companies. We understand that petitioners are not offering those exhibits for the truth of the matters contained therein. Thus, we do not sustain respondent's hearsay objections.↩
16. Respondent also points out that Gill reported income from the racing activity in his personal income tax returns and that Quilting accounted for the race car expenses in a separate category from its other advertising expenses. The fact that Gill kept the winnings from the racing activities and reported those winnings in his returns means only that Quilting was not in the trade or business of racing. Nor do we not find it significant that Quilting accounted for its race car sponsorship in a separate category from the rest of its advertising. That sponsorship was admittedly a unique type of advertising within its industry.↩
17. Quilting also contends that its sponsorship of certain race cars was designed to assist it in marketing stencils for use on vehicles. However, we need not, and therefore do not, consider this contention because we agree with Quilting's principal argument that its sponsorship of race cars was intended to generate publicity for itself.↩
18. Although not entirely clear, we conclude on the basis of the entire record that Quilting's practice of displaying a picture of one of the race cars at the trade shows in which it participated took place during at least some of the years at issue.↩
19. Gill and Pringle were unacquainted prior to the time Pringle approached Gill concerning a sponsorship, and Pringle was a track champion at that time. The races in which Pringle participated during the years at issue received coverage by the national media.↩
20. This figure is computed by subtracting the following two items (discussed below) from the $ 30,910 total deducted by Quilting as the cost of its race car sponsorship for its taxable year ended April 30, 1987: (1) The $ 3,000 claimed with respect to the trailer that was used principally to haul business supplies, and (2) the $ 1,600 claimed with respect to the semitrailer that was not used in connection with Quilting's race car sponsorship.↩
21. Petitioners contend that the amount incurred by Quilting for its race car sponsorship during each of its taxable years at issue was reasonable because it equaled only 2.17 percent of gross receipts for the taxable year ended April 30, 1987, and 2.94 percent of gross receipts for the taxable year ended April 30, 1988. Petitioners rely on Brallier v. Commissioner, T.C. Memo. 1986-42, where we allowed a corporation to deduct the cost of sponsoring certain race car activities to the extent they did not exceed three percent of the taxpayer's gross receipts. Our conclusion in that case was premised upon our finding that such a level of expenditures was expected of the taxpayer, a franchisee of a national restaurant chain, in order to promote the chain's restaurants generally and that the chain accepted the taxpayer's racing sponsorship expenditures as a substitute for contributions to the chain's national advertising fund. Our holding in Brallier was thus based on the particular circumstances of that case, and we did not intend to create a rule of thumb for deciding whether a certain level of expenditure was reasonable or unreasonable. See also Lang Chevrolet Co. v. Commissioner, T.C. Memo. 1967-212↩, where we found that racing expenditures of .7 and one percent of gross sales reasonable for a taxpayer in a "highly competitive" business.
22. This amount consists of $ 3,077 to sponsor Gill and $ 3,077 to sponsor Pringle.↩
23. The amounts we have allowed relate not only to the race car sponsorship but also to the trailer and semitrailer used in Quilting's business. We have allowed Quilting to deduct $ 2,700 with respect to the trailer and the entire $ 1,600 claimed with respect to the semitrailer.↩
24. Because the record does not disclose the value of the use of the trailer in connection with Gill's race car activity, we may, and will, use a pro rata portion of the deduction claimed by Quilting to measure the constructive dividend received by Gill. See United Aniline Co. v. Commissioner, 316 F.2d 701, 705 (1st Cir. 1963), affg. T.C. Memo. 1962-60↩.
25. With respect to Quilting's taxable year ended April 30, 1986, it appears respondent made her determination under the wrong version of sec. 6653(a). Sec. 6653(a)(1)(A) and (B) are applicable only to returns due (without regard to extensions) after December 31, 1986. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(e), 100 Stat. 2743. Because Quilting's return for the taxable year ended April 30, 1986, would, under sec. 6072(b), have been due July 15, 1986 (the 15th day of the third month after the end of that year), the provisions of sec. 6653(a) prior to their amendment by the Tax Reform Act of 1986 would have applied to that return. Since the Tax Reform Act of 1986 did not make changes in sec. 6653(a) that would affect the outcome of the instant case, we will treat respondent's determination as having been made under the version of sec. 6653(a) applicable to Quilting's return for its taxable year ended April 30, 1986.↩
26. Section 6661(b)(2)(B) provides for the reduction of an understatement by that portion that is attributable to either (1) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment; or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.↩
27. The record is insufficient for us to decide whether or not respondent considered and/or rejected a request for a waiver. Mailman v. Commissioner, 91 T.C. 1079, 1084↩ (1988).